[Cite as *State v. Satterfield*, 2013-Ohio-5551.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 12 BE 22 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| WILLIAM JAY CEE SATTERFIELD, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:          Criminal Appeal from Common Pleas
                                   Court, Case No. 11 CR 284.

JUDGMENT:                          Affirmed.

APPEARANCES:
For Plaintiff-Appellee:            Attorney Chris Berhalter
                                   Prosecuting Attorney
                                   Attorney Helen Yonak
                                   Asst. Prosecuting Attorney
                                   147-A W. Main Street
                                   St. Clairsville, OH 43950

For Defendant-Appellant:           Attorney Samuel H. Shamansky
                                   Attorney Donald L. Regensburger
                                   Attorney Colin E. Peters
                                   Samuel H. Shamansky Co., LPA
                                   523 South Third Street
                                   Columbus, OH 43215

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

                                   Dated: December 5, 2013

DeGenaro, P.J.

{¶1} Defendant-Appellant, William Jay Cee Satterfield, appeals the May 7, 2012 judgment of the Belmont County Court of Common Pleas convicting him of one count of murder and sentencing him accordingly. On appeal, Satterfield asserts that his conviction is against the manifest weight of the evidence. Upon review, Satterfield's assignment of error is meritless. The outcome of this case turned on credibility determinations best made by the jury. In convicting Satterfield the jury did not lose its way so as to create a manifest miscarriage of justice. Accordingly, the judgment of the trial court is affirmed.

### Facts and Procedural History

{¶2} On October 7, 2011, Satterfield shot and killed his neighbor's boyfriend, Kevin Smith, claiming the shooting was accidental. The Belmont County grand jury indicted Satterfield on one count of aggravated murder (R.C. 2929.01(A)), and one count of murder (R.C. 2903.02(A)), both with firearm specifications (R.C. 2941.145). The matter proceeded to a jury trial on April 17, 2012.

{¶3} Grace Wineman, Smith's girlfriend of five years testified that she had lived at the Abby's Crossing apartments in Bethesda for approximately five weeks. Over the course of their relationship, Smith sometimes lived with her.

{¶4} On October 6, 2011, Wineman came home from work at approximately 4:30 p.m. She and Smith went to the home of Smith's mother Denise Wheeler where they had a campfire. They brought Wineman's dog Rex along with them, a 35 pound "border collie terrier lab mutt." Wineman drank "a beer or two" and Smith was drinking beer. Smith had been feeling ill for over a week and vomited after he ate dinner. At approximately 11:00pm they departed to go to Smith's cousin Laramie's house. They stopped at Wineman's apartment first to retrieve her wallet. When she got out of her car at the apartment complex, Rex got loose; she called him and he would not come, and she decided to leave him running lose while they were gone. She said that at her prior residence, Rex had gotten "loose a million times," and had "never been a problem."

{¶5} They were at Laramie's house for a short time, just long enough for Smith

to smoke a marijuana joint, which he did in the hopes of settling his stomach. Wineman denied smoking marijuana that evening.

{¶6} They returned to Wineman's apartment and Smith was feeling much better. His appetite had returned and Wineman began to prepare him some food. The dog was inside the apartment. While Wineman was in the kitchen she heard a knock on the door. Smith went to answer it; at that time he was still wearing his boots. Satterfield was at the door wearing army fatigues, with a beer in his hand. He called Smith a "b*tch and a p*ssy," and told him he knew that Smith didn't really live there and essentially threatened to tell the landlord. Wineman grabbed Smith by the arm and told him to come in the house, and that Satterfield was not worth fighting over. She closed the door and locked it. Smith came in the house, took off his boots right by the door and sat on the living room couch. The couch was located under a window at the front of the apartment. Wineman identified a photograph of the room which showed the location of the couch by the open, screen-less window, along with Smith's boots.

{¶7} Wineman said she then went back in the kitchen. Satterfield was still outside screaming, calling Smith a "b*tch." Wineman heard Smith respond "Bill Satterfield, you ain't never been nothing but a b*tch your entire life. Oh you got a gun? You're going to shoot me?" Wineman left the kitchen. She heard one gunshot. Smith was kneeling on the couch, facing the open window. One of his hands was up on the window and the other hand was hanging by his side. Then a second gunshot lit up the room. Wineman explained: "It was like - - it was like a torch. And it lit up everything outside. It lit up Bill [Satterfield] and his face, and his arm pointing the gun up at Kevin's head." Wineman could clearly see the gun in Satterfield's hand. He was standing straight in front of Smith the gun turned sideways. She said Satterfield appeared angry and was standing approximately three feet away from the window when he shot Smith.

{¶8} After Satterfield shot him, Smith "crumpled out of the window," head-first, landing on the grill outside. Satterfield was standing there and said: "I shot you now." Wineman ran outside and straightened Smith to try to prevent him from choking on his own blood. She then went to a neighbor's house and asked her to call an ambulance.

She then returned to her apartment, locked the dog in the bathroom and went to tend to Smith, who had a sustained a bullet wound to the left side of his forehead. The police, ambulance and Smith's mother arrived shortly thereafter. Wineman spoke with a detective at the scene and was interviewed more comprehensively on October 14, one week after the shooting.

**{¶9}** On cross, Wineman agreed that the shooting was traumatic and startled her quite a bit. She maintained she did not smoke marijuana the night of the shooting, though she admitted to using the drug in the past. She denied telling a detective that she smoked marijuana that evening. She said that if she indicated on the video of her interview with the detective that "they" had smoked marijuana, she was referring to others present that evening, not herself. When confronted with her October 18, 2011 written statement: "Then went to Laramie's [a brother], hung out for a few minutes and smoked," she again said she was not referring to herself. While questioned on redirect, Wineman testified that at the time of the shooting she had quit smoking marijuana due to her job as a home health aide; however, on recross, she conceded that she had never been drug tested as part of her current job.

**{¶10}** Denise Wheeler, the victim's mother, testified that on the evening Smith was killed he and Wineman came to her home and made a bonfire in the back yard. Wineman's dog Rex was with them. She confirmed that Smith was feeling ill that evening and that he drank "a couple" beers. Later after Smith left she heard gunshots in the distance, instinctively worried about her son, and went directly to Abbey's Crossing. She saw that Smith had been shot in the head and ran to him. Wineman was upset and screaming. Smith was lying on the ground with his feet pointing towards the apartment window. Wheeler got Wineman to calm down and noticed her son's legs were stiffening and she started to rub them. She also noticed that he was in socked feet and thought this was odd because he always wore shoes when outside because he had an aversion to anything touching his feet. She also specifically noticed that his socks were dry. Smith was life-flighted to a Pittsburgh hospital where he died several days later from his injuries.

{¶11} David Cassanta, a ranger for the Ohio Department of Natural Resources, was the first to respond to the scene; he handcuffed Satterfield. Satterfield told Cassanta that he shot Smith. Cassanta stated that when he got to Smith, he was positioned on the ground with his feet pointing towards the open apartment window.

{¶12} Ohio State Highway Patrol Trooper Joseph Weaver testified that when he arrived on scene, Smith was lying in the grass with his feet toward the open window by the grill. Although it was cold outside, Smith was not wearing a coat or shoes. The trooper identified a photograph of the inside of the apartment showing a pair of boots lying beside the couch. He inquired about the boots and learned they belonged to the victim. He rendered first aid to Smith and said he did not smell anything unusual or any alcoholic beverages on his person.

{¶13} After the scene was secured and Smith was taken away by ambulance, Trooper Weaver tried to comfort Wineman, who was very upset and crying. Over objections, Trooper Weaver testified that Wineman told her that Smith had been outside arguing with Satterfield about her dog barking, and that Satterfield was drunk and Wineman told Smith it was not worth it to argue with him. She told him that Smith came inside but Satterfield was still outside yelling at him. She said Smith then went to the window, opened it and continued to argue with Satterfield. From the kitchen Wineman said she heard a gunshot, looked to see what happened, heard a second gunshot and then saw Smith fall out of the window.

{¶14} Robert Mills, an EMT and Assistant Chief of the Belmont Fire Department testified that when he responded to the scene, Smith was lying on the ground with his feet facing the building. Jeff Doty, a paramedic confirmed this was Smith's position on the ground when he arrived.

{¶15} The State then played Satterfield's two 911 calls for the jury. On the first call, Satterfield sounds very agitated and spends 27 minutes complaining to operators and then a sheriff's deputy about his neighbors' dog running loose while the neighbors were not home. He complained that it was impossible for him to go outside or to take his own dog outside without the neighbor's dog running at him. He threatened to kill the

dog if the sheriff's department did not send an officer out. He stated that he was an airborne infantryman in the Army. He stated that earlier in the evening he went outside with his crossbow but the dog did not attack him. He was advised to call animal control in the morning and not to go outside with his weapon at night.

{¶16} On the second call, which is just under 6 minutes long, Satterfield tells the 911 operator: "Yeah, I just had to shoot a man." He stated he went outside to talk to Smith about the dog, and then came back over to Smith with his Taurus Judge pistol, for which he has a concealed carry license. He said Smith smacked him a couple times and then Smith came out of his window and said "what the f*ck, what's going on, you want some beef?" Satterfield said he then walked up to the window and told Smith he did not want trouble. Smith hit him again so he pulled out his gun. After Smith hit him again and the gun went off, Smith rebounded with another hit and the gun went off a second time, a bullet hitting Smith in the head. Satterfield later exclaimed to the operator: "The thing is I just killed a f*cking man over a dog that I called the deputy sheriff over earlier. * * * I didn't even mean to shoot the f*cking guy - he hit my f*cking hand that had the pistol in it and it went off and shot him in the f*cking head!"

{¶17} Dr. Abdulrezak Shakir, the forensic pathologist for the Allegheny County Medical Examiner's Office testified that Smith died as a result of the gunshot wound to the head. He opined that the end of the gun that fired the bullet was in front of Smith's face. Based upon the lack of soot or stippling (small abrasions on the skin) near the entrance wound, Dr. Shakir opined that the end of the gun was more than two feet away from Smith's head when it was fired. Further, he found no evidence of stippling or powder burns on Smith's hands. He said that if Smith's hands had been in the way of the travelling bullet and had been within two feet of the gun, he would have expected to see stippling on the hands. Photographs from the autopsy were admitted as evidence. On cross, he conceded that his examination was done over 7 days after the shooting and that he would have expected any soot to have been removed at the hospital. However, he would not have expected the stippling, which are abrasions, to heal in that time.

{¶18} Edward Lulla, a crime scene agent with the Ohio Bureau of Criminal

Investigation and Identification testified that he arrived on the scene at 4:00 a.m. on October 8, 2007. He identified a number of photographs he took, which were admitted as exhibits. Because he was informed that two shots were fired, only one of which hit the victim, he proceeded to look for the second bullet, but ultimately never found it. Based on the location of the collapsed grill just outside the window, the blood saturation stains on the grass, and the blow flow pattern on the grill, Agent Lulla opined that Smith was behind the grill when he was shot, ultimately falling onto it. He also stated that "unless [Smith] was very thin and could fit between the grill and the wall, [he] assume[ed] [Smith] was inside" the apartment when he was shot. On cross, Agent Lulla conceded that because he did not see the position of the grill before the shooting, he did not know of its exact position before it collapsed.

{¶19} Joshua Bar, a forensic scientist assigned to the firearms section at BCI testified about Satterfield's gun and markings on the bullets. He determined that Satterfield's gun, a double-action revolver, was the weapon used to kill Smith and that the gun worked properly. He also checked the trigger pull and determined that if the hammer was cocked and ready to fire it would take three pounds of pressure to fire the gun; if the hammer was not cocked it would take 12 pounds of pressure to fire it.

{¶20} Chief Warrant Officer Kenneth Tater of the Ohio Army National Guard testified generally about the weapons training that soldiers receive in boot camp. He agreed that they are taught never to point a weapon at someone they did not intend to engage and agreed if they do not intend to fire the weapon there is no need to put a finger on the trigger.

{¶21} Detective-Sergeant Ryan Allar of the Belmont County Sheriff's Office interviewed Satterfield after the shooting and testified about his investigation of the crime. Among other things, Det. Allar said he got a chance to meet Wineman's dog in person and found it to be a playful, medium-sized, younger dog. He also looked at the victim's socks, which were ultimately admitted into evidence, and noted the socks did not appear to be worn by someone walking around outside without shoes; they were fairly clean.

{¶22} The video of Det. Allar's three-hour long interview with Satterfield was

played for the jury. Satterfield spent considerable time discussing his familiarity with firearms. His version of events as related to Det. Allar was similar to what he told the 911 operator, except he told Det. Allar that Smith smacked the gun itself (as opposed to Satterfield's hand), causing the gun to fire. Satterfield explained that it was necessary for him to bring a weapon to confront Smith because Smith was under the influence of drugs. Satterfield maintained that the shooting was accidental. Nonetheless, he admitted that just before shooting Smith, he threatened to kill him if he laid a hand on him again, and then cocked the hammer and aimed the gun at Smith's head.

**{¶23}** A portion of Det. Allar's interview with Wineman was played for the jury during cross-examination. Although it was apparently somewhat difficult to hear, Wineman seemed to state "we smoked a joint," when discussing what she and Smith did earlier in the evening before the shooting.

**{¶24}** After the State rested its case, the defense requested a jury view, which was granted. The defense presented no witnesses and rested its case.

**{¶25}** After considering all the evidence the jury found Satterfield not guilty of aggravated murder, but guilty of murder, with the accompanying firearm specification. After a hearing, the trial court sentenced Satterfield to a term of 18 years to life: a three year mandatory term on the firearm specification to run consecutively to the 15 years to life term for the murder conviction.

## Manifest Weight

**{¶26}** In his sole assignment of error, Satterfield asserts:

**{¶27}** "Appellant's conviction was against the manifest weight of the evidence, in violation of his right of due process as guaranteed by the Fourteenth Amendment to the United States Constitution."

**{¶28}** "Weight of the evidence concerns the inclination of *the greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other." (Emphasis sic.) *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. *Id.* This is so because the triers of fact are in

a better position to determine credibility issues, since they personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill,* 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996); *State v. DeHass,* 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶29}** To determine whether a verdict is against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387.

**{¶30}** Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the factfinder lost its way.' " *State v. Pallai,* 7th Dist. No. 07 MA 198, 2008-Ohio-6635, 2008 WL 5245576, ¶31, quoting *State v. Woullard,* 158 Ohio App.3d 31, 2004-Ohio3395, 813 N.E.2d 964, 1181 (2d Dist.). In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke,* 7th Dist. No. 99 CA 149, 2002-Ohio-1152, ¶13, citing *State v. Gore,* 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶31}** Satterfield was convicted of one count of murder, pursuant to R.C. 2903.02(A) which proscribes purposefully causing the death of another, with a firearm specification pursuant to R.C. 2941.145. "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A)

**{¶32}** Satterfield does not dispute that he caused Smith's death; rather he contends that the jury's finding that he acted purposely is against the manifest weight of the evidence. He contends his actions were accidental, not purposeful.

{¶33}  Satterfield's chief argument on appeal is that the eyewitness testimony of Wineman, the victim's girlfriend, is not at all credible.  Wineman testified that while she was in the kitchen, Smith went to answer the door, still wearing his boots, to find Satterfield at the door wearing army fatigues, with a beer in his hand, calling Smith derogatory names.  Wineman said she grabbed Smith by the arm, told him to come in the house, and that Satterfield was not worth fighting over, closed the door and locked it.  Smith then came in the house, took off his boots right by the door and sat on the living room couch, which was located under a window at the front of the apartment.  Wineman said she then went back in the kitchen.  Satterfield was still outside screaming, calling Smith a "b*tch."  Wineman heard Smith respond "Bill Satterfield, you ain't never been nothing but a b*tch your entire life.  Oh you got a gun?  You're going to shoot me?"  Wineman left the kitchen.  She heard one gunshot.  Smith was kneeling on the couch, facing the open window.  One of his hands was up on the window and the other hand was hanging by his side.  Then a second gunshot lit up the room.  Wineman explained: "It was like - - it was like a torch.  And it lit up everything outside.  It lit up Bill [Satterfield] and his face, and his arm pointing the gun up at Kevin's head."  Wineman could clearly see the gun in Satterfield's hand; he was standing straight in front of Smith the gun turned sideways.   She said Satterfield appeared angry and was standing approximately three feet away from the window when he shot Smith.  Finally Wineman testified that after Satterfield shot him, Smith "crumpled out of the window," head-first, landing on the grill outside.  Thereafter she heard Satterfield say: "I shot you now."

{¶34}  Satterfield asserts that Wineman completely lacked credibility for several reasons; first, because she made inconsistent statements about her marijuana use on the day of the shooting; and second, because the events of the evening were so startling for her it would have been impossible for her to clearly recall what happened.

{¶35}  The latter contention is easily dispelled by the fact that Wineman was able to relate what happened to Trooper Weaver when he responded to the scene shortly after the shooting, and what she told him mirrored her testimony at trial.  With regard to Wineman's marijuana use, while the record does reveal that Wineman's statements

concerning her drug use were inconsistent, the jury was aware of those inconsistencies and able to judge her credibility accordingly. Even assuming Wineman was smoking marijuana prior to the shooting, and assuming arguendo she was still under the influence of the drug when the shooting occurred, that fact alone would not necessarily destroy the credibility of her testimony. *See, e.g., State v. Hudson,* 7th Dist. No. 09 MA 89, 2011-Ohio-1343 (conviction not against manifest weight of the evidence where eyewitness admitted she was high on crack cocaine and had not slept for five days when she observed the murder.)

{¶36} Most importantly, Wineman's testimony was supported by additional evidence at trial. Wheeler's testimony supported Wineman's that Smith was inside the apartment when he was shot. Wheeler testified about the placement of Smith's body, specifically that Smith was lying on the ground with his feet towards the building. The testimony of the responding officers and EMTs all confirmed the position of Smith's body at the scene. Significantly, Wheeler also noted that Smith's socks were dry and that he never went outside without socks on due to an aversion he had about things touching his feet. The socks themselves were also admitted into evidence.

{¶37} The above was further corroborated by the testimony of Agent Lulla, who opined that based upon the location of the collapsed grill just outside the window, the blood saturation stains on the grass, and the blow flow pattern on the grill, that Smith was behind the grill when he was shot, ultimately falling onto it. Agent Lulla felt that the most likely scenario was that Smith was inside the apartment when he was shot since the space between the wall and the grill would have been very narrow. Finally, Wineman's version of events is corroborated by the medical examiner's testimony that there was no stippling on Smith's hands or near the wound, indicating Smith was at least two feet away from the gun when it was fired and that his hands were not in the way of the gun as it was fired.

{¶38} Satterfield maintained to Det. Allar that after threatening to kill Smith if he slapped at him again, and then, after he leveled the gun at Smith's head with the hammer cocked, the gun accidently went off when Smith slapped again. The fact that Satterfield

was angry at Smith and Wineman over the dog, as shown by the first 911 call, shows that Satterfield acted purposely, not accidentally. Also Satterfield spoke at length with Det. Allar about his familiarity with guns, and the fact that he cocked the hammer and aimed the gun at Smith's head is indicative of purpose. There is little to support Satterfield's version of events aside from his own testimony, which has its own inconsistencies. For instance, he told the 911 operator that Smith hit his *hand,* causing the gun to discharge, while he told Det. Allar that Smith hit the *gun* itself.

**{¶39}** The jury had to decide whether Satterfield's version of events was true, or Wineman's was true. Where neither side's version of the events is completely unbelievable, it is not up to this court to make its own determination as to which side it believes. *Dyke, supra* at ¶13.

**{¶40}** In sum, Satterfield's assignment of error is meritless. The outcome of this case turned on credibility determinations best made by the jury. In convicting Satterfield the jury did not lose its way so as to create a manifest miscarriage of justice. Accordingly, the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Vukovich, J., concurs.